# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

REGINA THRASHER, OBO
A.S.,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-731

Dlott, J.

Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Regina Thrasher, on behalf of a minor child, A.S., brings this pro se action

pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of

Social Security (Commissioner) denying plaintiff's application for children's Supplemental

Security Income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc.

10), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply (Doc. 15).

## I. Procedural Background

A.S. was born in 2008 and was 10 years old at the time of the administrative law judge

(ALJ)'s decision. Plaintiff filed an application for children's SSI benefits on A.S.'s behalf in

November 2014, alleging disability due to attention deficit hyperactivity disorder (ADHD).

Plaintiff's application was denied initially and upon reconsideration. Plaintiff requested and was

granted a *de novo* hearing before ALJ Christopher Tinsdale. Plaintiff appeared at the June 14,

2017 ALJ hearing without an attorney or other representative.[1] On May 14, 2018, the ALJ issued

a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals

---

[1] At the hearing, the ALJ explained to plaintiff her right to be represented by an attorney or non-attorney, who could
help her obtain and submit records, explain medical terms, make requests, protect her rights, and present the
evidence in a light most favorable to A.S.'s case. (Tr. 137). Plaintiff declined representation and elected to proceed

Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, the claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202. An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

If an impairment does not meet a listed impairment, disability may nonetheless be established if the child's impairment is medically or functionally equivalent to a listed impairment. A child's impairment is "medically equivalent" to a listed impairment if it is "at

least equal in severity and duration to the criteria" of a listed impairment. 20 C.F.R. § 416.926. In determining whether a child's impairment(s) functionally equals the listings, the adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.* An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(3)(i). Day-to-day functioning may be "very seriously limited" when only one

activity is limited by the impairment or when several activities are limited by the impairment's

cumulative effects. *Id.*

If the child's impairment meets, medically equals, or functionally equals an impairment in

the listings, and if the impairment satisfies the Act's duration requirement, then the child is

considered disabled. 20 C.F.R. § 416.924(d)(1). If both requirements are not satisfied, then the

child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

## B. The ALJ's findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. [A.S.] was born [in] . . . 2008. Therefore, he was a school-age child on
> November 19, 2014, the date the application was filed, and is currently a school-
> age child (20 CFR 416.926a(g)(2)).
>
> 2. [A.S.] has not engaged in substantial gainful activity since November 19, 2014,
> the application date (20 CFR 416.924(b) and 416.971 *et seq.*).
>
> 3. [A.S.] has the following severe impairment: attention deficit hyperactivity
> disorder (ADHD) (20 CFR 416.924(c)).
>
> 4. [A.S.] does not have an impairment or combination of impairments that meets
> or medically equals the severity of an impairment listed in 20 CFR Part 404,
> Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
>
> 5. [A.S.] does not have an impairment or combination of impairments that
> functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).
>
> 6. [A.S.] has not been disabled, as defined in the Social Security Act, since
> November 19, 2014, the date the application was filed (20 CFR 416.924(a)).

(Tr. 15-26).

In determining that plaintiff's impairments were not functionally equivalent to a listed impairment, the ALJ found:

1. The claimant has no limitation in acquiring and using information. (Tr. 21).

2. The claimant has less than marked limitation in attending and completing tasks. (Tr. 22).

3. The claimant has less than marked limitation in interacting and relating to others. (Tr. 23).

4. The claimant has less than marked limitation in moving about and manipulating objects. (Tr. 24).

5. The claimant has no limitation in the ability to care for himself. (Tr. 25).

6. The claimant has no limitation in health and physical well-being. (Tr. 26).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r. Soc. Sec. Admin.*, 582 F.3d 647 (6th Cir. 2009) (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

Physicians and nurses at Crossroad Health Center (Crossroad) served as A.S.'s primary care providers. (Tr. 496-98, 565-601, 1024-1051). In October 2014, when he was six years old, A.S. presented with behavior problems and increased hyperactivity and was prescribed a low dose of stimulant. (Tr. 568). In December 2014, A.S.'s ADHD medication was increased, and he was referred to occupational therapy (OT) for an evaluation of his fine motor delay. (Tr. 496).

In January 2015, A.S. was seen at Cincinnati Children's Hospital for an OT evaluation of his fine motor delay. (Tr. 505). Plaintiff reported A.S. had difficulties buttoning and zipping and had other fine motor issues. *Id*. Plaintiff said A.S. could use utensils independently to feed himself, but he required cues and assistance in bathing, dressing, and brushing his teeth. (Tr. 506). Plaintiff also indicated A.S. was "very smart." (Tr. 506-07). The occupational therapist observed that A.S. struggled with appropriate attention but had no problems with communication, and his cognitive skills were age appropriate. (Tr. 508, 510). The occupational

6

therapist found him to be a "sweet 6 year old boy" with decreased coordination, attention, and fine motor skills and delayed self-help skills. (Tr. 510). She recommended OT every other week for three to six months and indicated his rehabilitation potential was good. *Id.*

That same month, A.S. was seen at Crossroad. Plaintiff reported that A.S. was hyper at home, but the school reported he was "fine." (Tr. 599). To address weight loss, A.S. was to be offered healthy food and given a packet of Instant Breakfast in his milk. (Tr. 599).

On January 30, 2015, A.S. was evaluated by consultative psychologist Dr. Norman Berg. (Tr. 537-543). Plaintiff reported that A.S. was bright and did well in school. (Tr. 537-38). Plaintiff indicated that A.S. did not have significant behavioral problems aside from talking too much and difficulty concentrating. (Tr. 537). She said A.S. had satisfactory sleep and did not wet the bed. (Tr. 540). Dr. Berg noted that A.S. was somewhat uncoordinated but had no difficulty using his arms or hands, sitting, standing, or walking. (Tr. 538). A.S. reported feeling calmer with his medication, he was cooperative, and he was not hostile, aggressive, or contrary during the exam. (Tr. 538-39). A.S.'s mental status exam was normal. (Tr. 540-41). Dr. Berg found A.S. was hyperactive and at times had difficulty focusing. (Tr. 540-41). Dr. Berg opined A.S. had average to above average intelligence, though he had some difficulty with focus due to his hyperactivity. (Tr. 543). Dr. Berg further opined that due to hyperactivity, A.S. might have difficulty completing tasks but he could interact fairly well with others. *Id.*

In March 2015, A.S.'s school-based therapist Shamar Oglesby, LSW, noted that A.S. was in a regular classroom. (Tr. 552). Mr. Oglesby met with A.S. weekly for individual therapy. He opined that A.S. had a difficult time controlling his emotions, but he could relate to peers and maintain friendships and was respectful towards school staff. (Tr. 545). Mr. Oglesby reported

that A.S. functioned as independently as would be expected of a child his age, though at times he had some difficulty following instructions because of his ADHD. *Id.* Mr. Oglesby reported that A.S. did not have difficulty following through, communicating, or caring for himself, though he had trouble paying attention and focusing in class and dressing himself. (Tr. 547). He reported that A.S.'s impairment had been ongoing for about six months, and he was responding well to treatment. (Tr. 548).

In March 2015, A.S. was again seen at Crossroad and given a patch version of his ADHD medication. (Tr. 583-84). At an office visit on March 13, 2015, plaintiff reported that A.S. was doing better but could still be inattentive at times. Plaintiff also reported that A.S. had infrequent head and stomach aches and was sleeping well. (Tr. 596). A.S.'s ADHD medication was increased. (Tr. 596). That same month, A.S. began his OT at Cincinnati Children's Hospital for lack of coordination and fine motor delay. (Tr. 607). A.S. continued with sessions about every two weeks until mid-June. (Tr. 607, 630, 640, 650, 661, 783, 794, 805). At the end of March, A.S. had a speech evaluation which showed no need for formal speech therapy. (Tr. 618). He demonstrated age-appropriate speech sound production; receptive language was high average; expressive language was within normal limits; A.S. communicated using complete sentences; play skills were age-appropriate; and social-pragmatic language was judged to be within normal limits. (Tr. 627).

In April 2015, A.S.'s medical provider reported he was doing "really well" on his ADHD medication. (Tr. 593). He was to increase the Instant Breakfast packets in 8 ounces of milk to three times per day to help with weight gain, and he was given Cyproheptadine to stimulate his appetite. (Tr. 587).

8

In June 2015, Annie Schellinger, LSW, conducted a diagnostic assessment of A.S. for The Children's Home of Cincinnati (The Children's Home). (Tr. 676). At this assessment, plaintiff indicated she believed A.S.'s medications were suppressing his appetite, and he had recently become excessively frightened of bugs. (Tr. 677). A.S.'s mental status exam was normal. (Tr. 681). Ms. Schellinger noted that A.S. was cooperative, played very well by himself, and was polite, focused, and attentive. *Id.* She found that A.S. met the diagnostic criteria for ADHD. (Tr. 684). The recommended treatment plan was for mental health counseling to assist A.S. in developing skills in paying attention, ignoring distractions, and completing tasks. (Tr. 686). Later that month, A.S.'s OT was discontinued so he could "access psychology services to help with attention concerns." (Tr. 807).

At a July 2015 follow up visit for ADHD, Crossroad progress notes indicate that A.S.'s ADHD "medications are working well" and that counseling at The Children's Home "seems to be going well." (Tr. 1046). A.S. denied stomach aches, headaches, or difficulty sleeping. (*Id.*). His medication was changed back to pill form and renewed for three months. (Tr. 1046, 1048). One week later, plaintiff told Ms. Schellinger at The Children's Home that she was concerned about side effects from A.S.'s medications, including paranoia. (Tr. 706).

In August 2015, The Children's Home reduced A.S.'s appetite medication as his weight was "good." A.S. was to start on Concerta, a different ADHD medication. (Tr. 693). Plaintiff reported that A.S.'s grades had declined, and paranoia had started after a visit with his biological mother in May. His therapist suggested the two might be related. (Tr. 693). On mental status exam, A.S. was polite but fidgety and did not always respond to questions. His mental status exam was otherwise normal. (Tr. 697).

At his September 2015 appointment with The Children's Home, plaintiff reported that A.S. still had poor functioning and his medication was increased. (Tr. 719). Two weeks later, A.S. went to Crossroad, and plaintiff complained that he did not have a good appetite. (Tr. 1043). The medical provider noted that A.S. was healthy, The Children's Home was treating his ADHD and helping with "fears per grandma," and A.S. had fine motor delay. (Tr. 1042).

A.S. returned to Cincinnati Children's Hospital in October 2015 for additional OT for opening food containers, buttoning, zipping, and tying shoes. (Tr. 824). At this OT evaluation, A.S. had some hand weakness and fine motor delay, which was below age expectations, including difficulty opening packages/containers, buttoning/zipping clothing, and tying shoes. (Tr. 827). He had difficulty sustaining attention to task, which could impact his ability to practice and refine his fine motor skills, and difficulty socializing with peers. (Id.). His prognosis was good "with appropriate interventions and home exercise program adherence due to: patient age and family support." (Id.).

A.S. continued with OT about once a month through May 2016. (Tr. 844, 856, 867, 877, 887, 897). By May, A.S. met his OT goals and his providers discontinued his regular sessions "due to [his] progress in meeting all of family's functional concerns." (Tr. 900).

On November 5, 2016, A.S. had a "routine child health examination without abnormal findings." (Tr. 1032). It was reported that his stomach aches did not occur daily and seemed "related to his stress at school." (Tr. 1032-33). His medical provider did not believe A.S.'s stomach issues were related to his ADHD medication as A.S. had vomiting issues before starting Strattera and was "stressed out at school with bullies." (Id.). The following month, A.S. returned to Crossroad. Plaintiff indicated A.S. had been throwing up after taking his medication,

so she stopped giving it to him. (Tr. 1029). Lashandra Duncan, FNP, instructed plaintiff to give A.S. a liquid diet and gradually return him to a normal diet, as he was feeling better during the appointment. (*Id.*).

In January 2017, A.S. was seen at Crossroad for vomiting and stomach aches. He was treated for constipation with Miralax and his symptoms had resolved. Plaintiff was advised to watch A.S.'s diet and to continue treatment with The Children's Home. (Tr. 1026).

Plaintiff had an ADHD consultation with Dr. Jayna Schumacher at Cincinnati Children's Hospital in February 2017. (Tr. 910). A.S.'s physical and neurological examinations were normal, and A.S. was observed to be "a friendly and sociable young boy" who was "very active in the room" and demonstrated no repetitive behaviors. (Tr. 924-25). Plaintiff reported that A.S. participated in Big Brothers and Big Sisters for six months but his interactions were "not typical" due to medication side effects. (Tr. 922). Plaintiff also reported that A.S.'s academic performance was okay until a week before, and she believed A.S. could function with accommodations for attention. (Tr. 923). Plaintiff reported that A.S. had tried multiple ADHD medications that helped but were less effective over time. (Tr. 922-24). At this visit, A.S. was not on any ADHD medication because of side effects. (Tr. 925). "Active concerns included decreased independence with ADLs and decline in academic performance, and safety issues at school related to bullying." (*Id.*). Dr. Schumacher told plaintiff that she should consider returning A.S. to OT to address fine motor skills and attending ADHD parenting groups. (Tr. 925).

## E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in finding that A.S.'s impairments do not meet Listing 112.11 for ADHD; (2) the ALJ erred in finding that A.S. has less than marked limitation in the domain of interacting and relating with others; (3) the ALJ erred in determining that A.S. has no limitation in the ability to care for himself; and (4) the ALJ erred in determining that A.S. has no limitation in the domain of health and physical well-being. (Doc. 10).

### 1. Listing 112.11 for ADHD

Plaintiff contends that the ALJ erred in finding A.S. did not meet Listing 112.11 for ADHD. *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 1.[2] The ALJ stated that A.S. did not meet Listing 112.11 because "he did not have marked or extreme limitations in the 'paragraph B' criteria. Specifically, as discussed in detail through the remainder of this decision, the claimant has been able to perform well academically despite his ADHD." (Tr. 15). Plaintiff challenges the ALJ's finding regarding A.S.'s academic performance. She alleges that the records show

---

[2] Listing 112.11 for neurodevelopmental disorders for children age 3 to attainment of age 18 requires claimants to satisfy both the "A" and "B" criteria of the Listing:

    A. Medical documentation of the requirements of paragraph 1, 2, or 3:
     1. One or both of the following:
        a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
        b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
     2. Significant difficulties learning and using academic skills; or
     3. Recurrent motor movement or vocalization.
AND
    B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
     1. Understand, remember, or apply information (see 112.00E1).
     2. Interact with others (see 112.00E2).
     3. Concentrate, persist, or maintain pace (see 112.00E3).
     4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

A.S. has "poor classroom performance, lack of attention, concentration, due to ADHD and behavior challenges, impulsive, ODD behavior, [and] poor organizational skills." (Doc. 10 at 1).

The ALJ reasonably determined that A.S. was able to perform well academically despite his ADHD diagnosis. (Tr. 19). A report from November 2014 indicated that A.S. received instruction in a regular classroom setting without special instruction. (Tr. 534). When A.S. was in first grade in 2014 and 2015, he received mostly As and Bs. (Tr. 19, 324). In 2016, testing of his cognitive abilities placed him within the average range when compared to his same age peers. (Tr. 450). His teachers reported that A.S. applied learned skills/concepts to other topics, subjects, or settings at an equal or above average range when compared to his same aged peers. (*Id.*). In 2017, plaintiff was enrolled in an individualized education program (IEP) after demonstrating behaviors that interfered with his learning or the learning of others. (Tr. 17, 449). A.S. had a history of good grades in all academic classes. (Tr. 450). MAP assessments showed A.S. scored within the "on track" range in reading in the fall of the 2016-17 school year. His reading fluency and comprehension skills were in the average range when compared to his same aged peers; his written language scores were in the low average to average range; and his mathematical skills were in the below average and low average. (Tr. 450-51). It was noted that A.S. "excels at reading and working with computers." (Tr. 451). In September 2017, an Intervention Specialist completed a teacher questionnaire. (Tr. 17, 483). She reported that A.S. had no problems understanding and participating in class discussion, comprehending oral instructions, learning or applying material, applying problem solving skills, or completing assignments. (Tr. 477-78). She found that he had slight problems with math, waiting to take turns, and completing work without careless mistakes. (Tr. 478). She reported that A.S. had

obvious problems with attention, playing cooperatively, respecting adults in authority, and following rules. (Tr. 478-79). However, A.S. had no problems moving about or manipulating objects, handling frustration, caring for himself, using good judgment with his safety, or knowing when to ask for help. (Tr. 481).

To be sure, the academic records from 2017 indicate that A.S. experienced additional disciplinary and behavioral issues that impacted his learning. Nevertheless, the ALJ's conclusion that A.S. was able to perform well academically is substantially supported by the record evidence. As such, A.S. did not demonstrate a marked or extreme limitation in his ability to understand, remember, or apply information for purposes of the Listing 112.11(B)(1) criteria, nor has plaintiff shown the evidence demonstrates a marked or extreme limitation in the remaining "B" criteria of the listing. Plaintiff appears to disagree with the assessments of A.S.'s teachers and other providers, but she has failed to demonstrate that the ALJ erred in evaluating this evidence. Accordingly, plaintiff's first assignment of error should be overruled.

## 2. Domain of interacting and relating to others

Plaintiff alleges the ALJ erred in finding that A.S. has less than marked limitation in the domain of interacting and relating with others. She alleges that A.S. has symptoms that negatively affect his ability to interact and relate to others, such as disruptive and defiant behavior, difficulty following rules, and difficulty with social participation. (Doc. 10 at 10).

The ALJ acknowledged that some of A.S.'s symptoms impacted his functioning in this domain. These symptoms included A.S.'s "disruptive and defiant behavior, difficulty following rules, difficulty getting along with children his own age, engaging in bullying behavior, difficulties with social participation, argumentativeness, difficulty with emotional control, angry

outbursts, and impulsive behavior." (Tr. 23). The ALJ nevertheless found that while these symptoms limited A.S.'s functioning in this domain, they were not so severe that they markedly or extremely impaired A.S.'s ability to interact and relate to others. The ALJ determined that the overall record showed A.S. had the ability to successfully interact and related with others, including maintaining friendships, interacting with school staff respectfully, and effectively communicating with adults and peers. (*Id.*).

This domain considers how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). The Social Security Regulations outline the sort of interpersonal interactions a child of A.S.'s age should be able to perform:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, to tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). The regulations also provide examples of the types of limited functioning in this domain, such as having no close friends; avoiding or withdrawing from people you know or being overly anxious or fearful of meeting new people or experiencing new things; having difficulty playing games or sports with rules; having difficulty communicating; and having difficulty speaking intelligibly or with adequate fluency. *See* 20 C.F.R. § 416.926a(i)(3).

The ALJ's finding of less than marked limitation in the domain of interacting and relating to others is supported by substantial evidence. The ALJ reasonably determined that during the

relevant time frame, A.S. demonstrated the ability to successfully interact and relate to others. (Tr. 23). Licensed social worker Oglseby reported that A.S. was able to relate to and maintain friendships with his peers, but that he "sometimes has a hard time getting along with his classmates once he becomes upset." (Tr. 545). He also reported that A.S. was "very respectful" to school staff. (*Id.*). The Children's Home assessed that A.S. was cooperative, played very well by himself, and was polite, focused, and attentive. (Tr. 681). A teacher questionnaire rated A.S.'s functioning in the majority of the 13 activities in this domain as "no problem" or only "a slight problem." (Tr. 479). Six activities were rated "an obvious problem," while no activities were rated as "a serious problem" or "a very serious problem." (*Id.*). Plaintiff reported to Dr. Berg that A.S. interacted with others at a recreation center after school and friends occasionally visited. (Tr. 539). Dr. Berg assessed that A.S. could interact fairly well with others. (Tr. 543). No medical provider identified A.S. as having more than a "slight difficulty" with communication (Tr. 539), and a speech evaluation found no need for formal speech therapy. (Tr. 618). Mental status examinations routinely showed A.S.'s speech and eye contact were normal, and his behavior was cooperative and polite, albeit fidgety and requiring redirection. (Tr. 681, 697, 711). There is evidence in the record that two months prior to the ALJ hearing, A.S.'s reading teacher reported that he had a recent pattern of disrespectful and disruptive behavior and was refusing to complete work. (Tr. 439). Later that month, the public school created a behavior support plan and individualized education plan for A.S. to address these behaviors and A.S.'s need for supportive services. (Tr. 445-469).[3] While these more recent behaviors and symptoms undoubtedly impacted A.S.'s ability to relate and interact with others, for the relevant three-year period beginning November

---

[3] Even assuming, arguendo, that A.S.'s more recent behaviors and symptoms in April 2017 could be considered to markedly or extremely limit his functioning in the domain of interacting and relating to others, the evidence does not support a finding that such limitation had lasted or was expected to last "for a continuous period of not less than 12

2014, the ALJ's finding that this impact was less than marked is substantially supported by the record.[4]

### 3. Domain of caring for yourself

The ALJ determined that A.S. has no limitation in the ability to care for himself. (Tr. 25). The ALJ noted reports that A.S. feeds himself with utensils independently, watches television, and uses a computer. The ALJ also cited to evidence that A.S. routinely presented with normal physical exams, played well by himself and was polite, and was active and playful. The ALJ also noted a September 2017 teacher questionnaire that reported A.S. had no limitations in the ability to care for himself.

Plaintiff challenges the ALJ's conclusion that A.S. has no limitation in the ability to care for himself. (Tr. 25). Plaintiff alleges the teacher report upon which the ALJ relied should be discredited because the teacher did not live with A.S. and was unable to observe the problems A.S. has at home with daily activities like bathing, dressing, toileting, or wiping from a bowel movement. Plaintiff also contends the ALJ failed to consider A.S.'s poor sleeping habits and obsessive behavior like checking door locks in a room he has entered. (Doc. 10 at 12-13). Plaintiff alleges there is "no ongoing or continuous medical evidence or documentation [A.S.] is progressing or on target with all of his self-care skills. . . ." (Doc. 10 at 15).

The domain of self-care concerns "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in

---

months." 42 U.S.C. § 1382c(a)(3)(C)(i).
[4] To the extent plaintiff attempts to introduce additional information and evidence into the record about A.S.'s participation in the Big Brothers Big Sisters of Greater Cincinnati (Doc. 10 at 7-8, 10), she has failed to show that this evidence is new, and that good cause exists for her failure to include this information in the prior ALJ proceeding. *See* 42 U.S.C. § 405(g), Sentence Six; *see also Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir. 2002) (citing 42 U.S.C. § 405(g), Sentence Six; *Casey v. Secretary of Health and Human Services*, 987

appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k). Children of A.S.'s age (school-age children) "should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely." § 416.926a(k)(iv). Some examples of limited functioning in this domain include a child who consoles himself with activities that show developmental regression (for example, an older child who sucks his thumb); has restrictive or stereotyped mannerisms (for example, head banging, body rocking); does not spontaneously pursue enjoyable activities or interests (for example, listening to music, reading a book); engages in self-injurious behavior (for example, refusal to take medication, self-mutilation, suicidal gestures) or ignores safety rules; does not feed, dress, bathe, or toilet self appropriately for age; has disturbance in eating or sleeping patterns; or places non-nutritive or inedible objects in mouth (for example, dirt, chalk). *See* Social Security Ruling 09-7p, 2009 WL 369029.

Plaintiff relies extensively on her own reports of A.S.'s functioning in this domain, particularly with his ability to bathe, dress himself, or maintain hygienic toileting habits. But even where there is evidence which would support a contrary finding, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) ("If the Commissioner's decision is supported by substantial evidence, we must defer to that decision even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal citation and quotation omitted). In this case, there is countervailing evidence showing that A.S. had no limitation of functioning in this domain which

---

F.2d 1230, 1233 (6th Cir. 1993)). Therefore, there is no basis for ordering a remand under Sentence Six of 42 U.S.C. § 405(g).

substantially supports the ALJ's finding. A.S.'s school-based therapist reported that although A.S. at times had some difficulty following instructions because of his ADHD, he functioned as independently as would be expected of a child his age. (Tr. 545). Mr. Oglesby also reported that A.S. was able to care for his personal hygiene. (Tr. 547). While he also reported that A.S.'s motor skills resulted in trouble with dressing, he noted that A.S. was engaged in occupational therapy for this. (Tr. 547). The Children's Hospital records show that A.S.'s OT was effective and was subsequently discontinued at the point A.S. met the functional concerns that were presented, including dressing and tying his shoes. (Tr. 899-900). Likewise, as the ALJ noted, plaintiff's teacher reported in September 2017 that plaintiff had no problems in caring for himself. (Tr. 481). The reviewing psychologists and pediatricians also opined that A.S. had no limitations in caring for himself. (Tr. 168, 182). Even if the ALJ erred in finding there was "no" limitation in A.S.'s ability to care for himself, any error would be harmless because the medical and other evidence of record does not support a finding of marked or extreme limitation in this domain. The Court acknowledges that the testimony and reports of plaintiff support a finding that, at least when A.S. is at home, he exhibits limitations in caring for himself that were not adopted by the ALJ. Nevertheless, because the ALJ's finding that plaintiff has no limitation in this domain is substantially supported by the medical evidence and teacher's reports of record, it must be upheld, even if this Court would have arrived at a different conclusion based on the same evidence. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999).[5] Plaintiff's assignment of error should be overruled.

---

[5] Plaintiff contends there was no evidence that A.S. was progressing in his self-care skills, suggesting it was incumbent upon the ALJ to prove that A.S.'s ability to care for himself was *not* markedly limited. However, plaintiff, and not the Commissioner, bears the burden of proving disability. *See Lowery v. Comm'r, Soc. Sec.*

## 4. Domain of health and physical well-being

The ALJ determined that A.S. has no limitation in the domain of health and physical well-being. The ALJ found A.S. routinely presented with normal physical examinations, and he was described as "active and playful" and "friendly and sociable." (Tr. 26).

Plaintiff alleges that the ALJ improperly assessed this domain because A.S. has experienced weight loss, stomach discomfort, headaches, and insomnia. Plaintiff further alleges that side effects from A.S.'s medication include hallucinations, fear of the outside world, and a fear of bugs. Plaintiff alleges that A.S. exhibits symptoms of obsessive compulsive disorder, like checking his socks for lint, checking food labels for expiration dates, and other repetitive behaviors that limit his ability to enjoy life. (Doc. 10 at 22). Finally, plaintiff states that A.S. does not have the ability to keep himself safe and does not understand the difference between intentional hitting/assault and accidental touching by other children.

The health and physical well-being domain considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on a child's health and functioning that were not considered when evaluating the child's ability to move about and manipulate objects. *See* 20 C.F.R. § 416.926a(l). This domain "addresses how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body; that is, the child's health and sense of physical well-being." Soc. Sec. Ruling 09-8p, 2009 WL 396030. In evaluating this domain, the Commissioner considers whether the impairment limits a child's ability to perform activities independently or effectively when: (1) it

---

*Admin.*, 55 F. App'x 333, 341 (6th Cir. 2003) (burden of proof remains with claimant to show a marked limitation in relevant domain).

causes generalized weakness, reduced stamina, fatigue or poor growth, *id.* § 416.926a(l)(1); (2) it causes the claimant to take medications that limit performance of activities, *id.* § 416.926a(l)(2); and/or (3) it leads to periods of worsening, *id.* § 416.926(l)(3). Examples of physical effects that can result from a physical or mental impairment or the treatment thereof include: (1) feeling weak, dizzy, or fatigued; (2) allergic reactions, poor growth, changes in weight or eating habits, stomach discomfort, headaches and insomnia; (3) limitations in physical functioning because of therapy or treatment (such as chemotherapy or nebulizer treatments); and (4) exacerbations from the impairment that interfere with physical functioning. SSR 09-8p, 2009 WL 396030; § 416.926a(l)(4).

The ALJ's finding of no limitation in the domain of health and physical well-being is substantially supported by the record. As the ALJ reasonably determined, A.S.'s physical exams throughout the relevant period were consistently normal. (Tr. 574-3/7/14; Tr. 569-10/17/14; Tr. 567-12/10/14; Tr. 601-1/26/15; Tr. 598-3/13/15; Tr. 595-4/10/15; Tr. 1048-7/22/15; Tr. 1044-9/21/15; Tr. 1040-41-4/14/16; Tr. 1031-10/13/16; Tr. 1034-11/5/16; Tr. 1028-1/10/17; Tr. 925-2/21/17). A mental status examination in June 2015 at The Children's Home of Cincinnati was normal, and the therapist reported that A.S. "played well by himself and was very polite. He was focused and attentive." (Tr. 681). Other treatment notes from A.S.'s medical providers likewise reflected that A.S. was active and playful. (Tr. 748, 924). While A.S. periodically had issues with stomach aches and vomiting, these appeared to be related to school stress, and not his ADHD medication, and these conditions were treated conservatively with a laxative and a liquid diet. (Tr. 1026, 1029, 1046, 1032-33). To address weight loss, A.S. was to be offered healthy food, take Instant Breakfast in his milk, and given Cyproheptadine for appetite. (Tr. 587, 599).

21

Finally, the medical opinion evidence supports the ALJ's conclusion that A.S. did not have any limitation in the domain of health and physical well-being. (Tr. 168-noting no severe physical impairment or documented adverse impact of prescribed medication; *see also* Tr. 182). Even if the ALJ erred in finding "no limitation" of function in this domain, the error would be harmless. Plaintiff has not pointed to any medical evidence showing A.S.'s ADHD impairment and medications either markedly or extremely limited his ability to perform activities independently or effectively from the aspect of physical well-being. Plaintiff alleges A.S. exhibits symptoms of obsessive compulsive disorder and hallucinations, but the mental status exams and other medical evidence of record do not support these assertions. The undersigned notes that even where substantial evidence would support a different conclusion or where a reviewing court would have decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Her*, 203 F.3d at 389. Accordingly, because the ALJ's determination of no limitation in the domain of health and physical well-being is supported by substantial evidence, plaintiff's assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED**, and this matter be closed on the docket of the Court.

Date: 2/19/20

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

REGINA THRASHER, OBO
A.S.,

      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:18-cv-731

Dlott, J.

Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).